**TAB C**

**Exhibit B**

**Issue #1:  Timing of FDA production of documents**

*FDA's position*:

FDA is unable to provide the Court with an exact date for its completion of production of all documents responsive to Subpoena Requests 1, 2, 4, 6, 7(B), (D)-(F), and 13 because FDA's initial search has identified an estimated 120,375 pages of documents that are potentially responsive to these requests.  Presently, FDA estimates that it will take two months to collect and organize these documents and twenty months to complete the review, redaction, and supervisory review of the redactions (assuming three full-time employees are assigned to work on this project for six to eight hours per day, and spend approximately 3 minutes per page for review and redaction).  Thus, based on an estimated volume of up to 120,375 pages of documents, the total time to production is expected to be twenty-two months from the day the search begins.  FDA will make every effort to adhere to this timeframe.  If less than 120,375 pages of documents are ultimately identified, or if Dr. Selden is able to further refine his request as outlined below, the review and redaction times can be reduced proportionately (e.g., if only 71,975 pages are identified, the time to production could be reduced to about thirteen months).  If more than 120,375 pages are ultimately identified, the review and redaction times would be increased (e.g., if 140,000 pages are identified, the time to production would increase to twenty-seven months).

With respect to Subpoena Request 7(B), FDA has immediately available the three CRLs that FDA sent to Genzyme relating to its Fabrazyme product, as well as the table of contents for Genzyme's responses to these three CRLs.  With respect to Subpoena Request 7(D), FDA has immediately available the table of contents for the portions of the original BLA for Fabrazyme that relate to clinical safety and efficacy, as well as a Genzyme-prepared overview of the clinical safety and efficacy portion of the original BLA for Fabrazyme.  In the interest of prioritizing the

## Exhibit B

FDA resources that must be marshaled to produce documents pursuant to this request, FDA proposes to provide Dr. Selden with these tables of contents and overviews so that Dr. Selden can identify the order of priority for production of the documents that are responsive to this request. If Dr. Selden is willing to narrow his request using these materials, the time required by FDA for the production of the documents he seeks could be significantly reduced.

### Dr. Selden's Position:

The Court in the District of Massachusetts has already extended the pre-trial calendar in SEC v. Selden by six months to accommodate FDA's delay in responding to the subpoenas. The current schedule now requires all written discovery to be completed by October 30, 2006, with all depositions to be completed by end of February 2007. Nevertheless, the FDA now says that it will need another 22 months -- or until the middle of 2008 -- to complete the production. Surely this could not be the "prompt" FDA response that the Court had in mind when granting Dr. Selden's motion to compel (see Memorandum Opinion, Docket Entry No. 19 at 7 n.7), given that it would render the subpoenas essentially meaningless. Further, it would deny Dr. Selden a fair defense against a government enforcement action brought with the assistance of FDA itself. Lastly, FDA's proposed 22-month schedule is not defensible because it does not jibe with the realities of litigation document review. For example, under FDA's estimate, it will take six weeks for one person to review and process a single box of documents.[3] Even a conservative estimate of the review time for a box of documents in a complex litigation would be no more than 4-5 days per box, a period that can be accelerated with additional resource commitment or,

---

[3]    This figure is derived as follows: The FDA estimates a total production of 120,375 pages of documents. One standard size file box (or "banker's box") can hold approximately 2,500-3,000 pages of documents. FDA says it will take three people 22 months to complete this production, meaning that one person will need 22 months to complete approximately 13-16 boxes, or 6-7 weeks per box, per person.

## Exhibit B

specific to FDA, a waiver of the deliberative process privilege (see Issue #3, below). Thus, the

Court should order FDA to comply with the subpoenas on an accelerated basis by October 30,

2006, the end of the written discovery period in SEC v. Selden.

## Issue #2:  Request No. 3[4]

### (A)    Time range for CRLs to be produced

*FDA's position*:

FDA has agreed to produce every CRL issued by CBER between January 1, 2000 and

December 31, 2001, excluding those CRLs issued for products that were never approved, those

CRLs sent in response to Biologic License Application ("BLA") supplements rather than original

applications, and those CRLs issued for products for which user fees were not collected.

Applying these criteria to narrow Dr. Selden's request ensures that only CRLs issued for

products with applications that are similar to Replagal's application will be produced.  The

January 1, 2000 and December 31, 2001 time period proposed by FDA will result in the

production of all such CRLs for the year proceeding and the year following FDA's issuance of

the Replagal CRL, which was issued in January 2001.

FDA has identified 30 CRLs for products fitting the above criteria that were issued

during the relevant two-year time period.  This search required twelve hours of FDA staff time,

the review and redaction of these CRLs will require an additional 20 hours, and production

---

[4]    Request No. 3 of Schedule A calls for "[e]very complete response letter ('CRL') issued by the FDA's Center For Biologics Evaluation And Review ('CBER') from 1987 to the present."  The SEC v. Selden case concerns the Complete Response Letter of Transkaryotic Therapies, Inc. ("TKT").  In that action, the SEC alleges Dr. Selden fraudulently misrepresented what the CRL said and meant.  Complete Response Letters (sometimes referred to as "Complete Review Letters" or "CRLs") are "issued [by CBER] when the complete review indicates that there are deficiencies remaining that preclude the approval of the application or supplement at that time.  The Complete Response Letter will:  Summarize all of the deficiencies remaining, and [w]here appropriate, describe actions necessary to place the application/supplement in a condition for approval."  CBER Manual Of Standard Operating Procedures And Policies ("SOPP") 8405, version #4 (eff. Sept. 20, 2004).  The definition of CRL has also been revised several times during the relevant period.

## Exhibit B

should be complete by 10/3/06. If FDA were ordered to produce every CRL issued by CBER during the 18-year period sought by Dr. Selden, the resulting massive undertaking would require years of FDA staff time to search for, organize, review, redact, and produce the estimated 400,000 pages of responsive documents. As FDA has consistently maintained, such a request is "unduly burdensome and over broad" because it seeks documents "more than 18 years old," encompasses "many thousands of pages," and would thus "further strain FDA's already overburdened document production capacity." FDA Motion to Quash at 4, 8.

*Dr. Selden's Position*:

FDA's refusal to produce CRLs beyond the years 2000 and 2001 is a new position that FDA took only in the last three weeks. Nevertheless, Dr. Selden is willing to agree to a protocol that would make the production non-burdensome on FDA (see 2.B., below), but FDA has not been willing to discuss this option.

**(B)    Open issue regarding production of CRLs for unapproved products**

*FDA's position*:

FDA may not produce any CRLs for products that have not been approved because its regulations forbid FDA from releasing any information regarding unapproved BLA's. See 21 C.F.R. § 601.51(b) ("The existence of a biological product file will not be disclosed by the Food and Drug Administration before a biologics license application has been approved unless it has previously been disclosed or acknowledged."). The very existence of a BLA for a product that has not yet received FDA approval may be considered trade secret and confidential commercial information ("CCI"), and FDA's release of such information could constitute a violation of both the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331(j), and the Federal Trade Secrets Act, 18 U.S.C. § 1905, both of which carry individual criminal liability. See Jerome Stevens Pharms.

B - 4

## Exhibit B

v. FDA, 319 F. Supp. 2d 45 (D.D.C. 2004), aff'd in part, rev'd in part, 420 F.3d 1249 (D.C. Cir. 2005) (seeking $1.345 billion in damages for FDA's alleged release of trade secret and CCI contained in a new drug application).

Neither of these statutes, nor FDA's regulations, provide for an "attorneys' eyes only" exception for the release of trade secret or CCI. Should the court order FDA to produce the CRLs that Dr. Selden seeks, FDA would need to alert the hundreds of entities to whom these unapproved CRLs were issued during this 18-year period to permit them to intervene in the present action to defend their proprietary information. See 21 C.F.R. § 20.48 (requiring FDA to give notice to "a person who will be affected by a proposed disclosure of data or information contained in Food and Drug records" to permit them "to institute suit in a United States District Court to enjoin release of the records" and prohibiting FDA from "disclos[ing] the records involved until the matter and all related appeals have been concluded").

### Dr. Selden's Position:

FDA's stated position derives from a premise not at issue here; namely, that Dr. Selden is seeking the public disclosure of confidential information. Not so. Dr. Selden's interest in the materials is limited to defending himself in the government enforcement action; and FDA regulations specifically provide a process for limited disclosure of non-public information in connection with court proceedings:

> Data and information otherwise exempt from public disclosure
> may be revealed in Food and Drug Administration administrative
> proceedings pursuant to parts 10, 12, 13, 14, 15, 17, and 19 of this
> chapter or court proceedings, where data or information are
> relevant. The Food and Drug Administration will take appropriate
> measures, or request that appropriate measures be taken, to reduce
> disclosure to the minimum necessary under the circumstances.

### Exhibit B

21 C.F.R. § 20.86 ("Disclosure in administrative or court proceedings") (emphasis added).

Further, contrary to FDA's blanket assertion that it cannot produce any non-public information

without an extensive notice period and the exhaustion of all legal remedies by those affected,

FDA regulations contemplate production subject to measures that can be adopted "to reduce

disclosure to the minimum necessary under the circumstances."

Consistent with the above, Dr. Selden is willing to agree to the entry of a protective order

that would protect the confidentiality of the CRLs while permitting him limited use for purposes

of his defense. However, to date FDA has refused to engage in any dialogue on what measures

FDA believes are appropriate. Dr. Selden has already offered the following: first, Dr. Selden

will agree to an order precluding the use of any non-public information outside of the SEC v.

Selden litigation; second, Dr. Selden will agree to a protocol that limits CRL access to

"attorneys' eyes only"; and third, Dr. Selden will agree that if information from the CRLs is

referred to (by an expert, for example), such reference will not include the applicant name or

product; but rather refer to a numerical identifier (e.g., "CRL #1").

### Issue #3:  FDA Assertion Of "Deliberative Process" Privilege Over Entire Production

*FDA's position*:

FDA is not intending to assert the deliberative process privilege over every document

responsive to the subpoena. Indeed, Selden correctly asserts that FDA waived its deliberative

process privilege with respect to a limited number of documents provided to the SEC in a

completely unrelated matter, but the circumstances of that decision differed markedly from those

in the present action. For instance, FDA disclosed the documents at issue in that case to the

SEC pursuant to FDA regulations that permit the inter-agency sharing of documents. See 21

U.S.C. § 20.85.

## Exhibit B

With respect to any assertion of the deliberative process privilege, FDA does not believe that this issue is ripe for decision at this point in the litigation. FDA will not agree to summarily waive the deliberative process privilege before the agency has had a chance to assert the privilege in regards to specific documents and provide the Court with the reasoning for the assertion on a privilege log. FDA believes, however, and has consistently maintained, that Dr. Selden's requests seek "disclosure of information that is or contains . . . pre-decisional, and/or agency deliberative process information that is protected from disclosure under the applicable laws, regulations, or privileges." See FDA November 9, 2005 Letter (Attached to Selden's Motion to Compel Memo as Attachment D). A consistent policy of withholding information subject to the deliberative process privilege encourages full and frank discussion among FDA decisionmakers. See 21 C.F.R. § 20.62 (permitting intra-agency writings to be withheld from public disclosure); see also Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8-9 (2001) ("The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' by protecting open and frank discussion among those who make them within the Government.").

Moreover, FDA's decision to withhold privileged information in the present litigation must be analyzed anew, within the confines of the present action. See In re Sealed Case, 121 F.3d 729, 737-738 (D.C. Cir. 1997) ("Each time the deliberative process privilege is asserted the district court must undertake a fresh balancing of the competing interests, taking into account factors such as the relevance of the evidence, the availability of other evidence, the seriousness of the litigation, the role of the government, and the possibility of future timidity by government employees.") (internal citation and quotation marks omitted). The Court's failure to perform a

**Exhibit B**

"fresh" review of FDA's assertion of the deliberative process privilege would not only

negatively impact frank discussions among agency employees, but would also be a strong

disincentive for the agency to ever agree to a waiver of the privilege, regardless of the

circumstances. Because FDA has not to date asserted the deliberative process privilege in a

concrete setting, the issue is not ripe for judicial consideration.

_Dr. Selden's Position_:

Until very recently, FDA stated that it was contemplating a waiver of the "deliberative

process" privilege in this action as it did in the virtually identical SEC v. Biopure action.

However, it now says it will not waive the privilege, but that it is premature to discuss its

decision in court. FDA's denial of Dr. Selden's request is manifestly ripe for the Court's

decision. For several reasons, FDA's decision is both arbitrary and unreasonable.

First, as recently as June 28, 2006, the FDA agreed to waive the privilege, in its entirety,

in a virtually identical pending litigation in the District of Massachusetts also brought by the

SEC and involving the same regulatory branch of FDA. See SEC v. Biopure Corp., et al., Civ.

No. 05-11853-PBS (D. Mass., filed Sept. 15, 2005). There is no sound basis for denying Dr.

Selden the same. For example, FDA's only stated reason for asserting the privilege in this case

in contrast to Biopure is that the Biopure request came under 21 C.F.R. § 20.85, which provides

for the inter-agency sharing of information. See FDA's Position, above. However, both FDA

and the SEC have already agreed to use § 20.85 in this case, the same procedure used in Biopure,

to request this information from FDA, thus rendering FDA's sole distinction non-existent.

Second, the FDA's only stated justification for asserting the privilege -- that it would

"negatively impact frank discussions among agency employees" -- is inapplicable in this case

B - 8

**Exhibit B**

because Dr. Selden is not seeking to disclose FDA information to the public, and is willing to agree to a protective order that expressly precludes it.

Third, the effect of the FDA's position would be to eviscerate perhaps the most important reason the subpoenas were issued in the first place; namely, to obtain an understanding of the FDA's own reactions and interpretations of its discussions with the company, Dr. Selden, and the product application.

**Issue #4:  Depositions of FDA employees**

*FDA's position*:

The subpoenas served upon FDA by Dr. Selden in the present action also requested the depositional testimony of the FDA and the CBER records custodians.  Dr. Selden has informed FDA that he seeks such testimony in order to authenticate the records produced by FDA pursuant to these subpoenas.  In lieu of these depositions, FDA proposes to authenticate its records via Rule 902 of the Federal Rules of Evidence, consistent with FDA's standard practice when providing documents for use in third-party litigation.  see 21 C.F.R. § 20.3 (providing for the certification and authentication of FDA records).

Dr. Selden now seeks to impermissibly expand the present action to encompass his demands for the testimony of four FDA scientists.  Such testimony was requested by Dr. Selden pursuant to FDA's Touhy regulations in a letter dated March 29, 2006,  See 21 C.F.R. § 20.1, well after the instant litigation was begun.  Thus, this request is not part of the current case. After carefully considering this request, FDA permitted Dr. Selden to obtain the testimony of Dr. Walton, the FDA scientist who was previously deposed by the SEC.  See FDA Letter dated June 30, 2006.  FDA refused to grant Dr. Selden's request for the testimony of the three remaining

## Exhibit B

scientists, citing, among other concerns, "FDA's limited resources and the vast number of requests the agency receives for its personnel to testify."

As this Court has already acknowledged, these "subpoenas for testimony are not at issue here." Memorandum Opinion, Aug. 16, 2006, p.3 n.2. FDA's response to Dr. Selden's request for testimony pursuant to FDA's Touhy regulations may only be challenged by Dr. Selden under an arbitrary and capricious standard of review in an action under the Administrative Procedure Act ("APA"). Far from being a "meaningless gesture" as Dr. Selden contends below, such a requirement is well established by the longstanding precedent of this Circuit. See Houston Bus. Journal, Inc. v. Office of the Comptroller, 86 F.3d 1208, 1212 n.4 (D.C. Cir. 1996) (directing third-party litigant to "proceed under the APA, and the federal court will review the agency's decision not to permit its employee to testify under an 'arbitrary and capricious' standard").

*Dr. Selden's Position:*

Referenced by the Court in its Aug. 16, 2006 Memorandum Opinion (see p. 3 n.2), the testimony of FDA employees Karen Weiss, Duane Rieves and James Kaiser -- which Dr. Selden requested pursuant to FDA's "Touhy" regulations -- are central to his defense and he objects to FDA's refusal to make them available.

The only stated basis for FDA's denial of the testimony is that it would be "duplicative" of Dr. Walton. (FDA's reference above to "other concerns" having been identified in the letter is misleading. The letter specifically stated that it was denying Dr. Selden's request on the basis of the supposed "duplicative" nature of the testimony.) FDA's position is demonstrably false, as Dr. Selden has already communicated to FDA.

Further, with respect to any burden on FDA, Dr. Selden is willing to conduct the depositions during off hours and at any location. A similar procedure was approved by the Court

### Exhibit B

for FDA depositions in In re: Vioxx Products Liability Litig., No. MDL 1657, 2006 WL 784878,

*12 (E.D. La. Mar. 15, 2006).

Finally, FDA's suggestion of Dr. Selden bringing a separate APA action for relief is, with

all due respect, a meaningless gesture under these particular circumstances; where there is an

ongoing enforcement action brought by the SEC with the assistance of FDA (including the

FDA's permission of "off the record" interviews by SEC of several FDA employees), and is now

heading for trial.

### Issue #5:  Payment of costs for production of FDA documents

*FDA's position*:

FDA intends to renew its request that Selden be responsible for the significant costs

associated with responding to his voluminous subpoena requests, which FDA estimates will

require it to dedicate thousands of staff hours in order to produce over 120,000 pages of

responsive documents.  See Fed. R. Civ. P. 45(c)(2)(B) ("[A]n order to compel production shall

protect any person who is not a party . . . from significant expense resulting from the inspection

and copying command.").  In Northrop Corp. v. McDonnell Douglas Corp, the D.C. Circuit

instructed courts to "fully recognize the burden of imposing on a non-party the effort and

expense of discovery, particularly when the expense will be borne by the taxpayers." 751 F.2d

395, 407 (D.C. Cir. 1984); see also Linder v. Calero-Portocarrero, 251 F.3d 178, 182 (D.C. Cir.

2001) (concluding that "fee shifting was mandatory" under Rule 45 and requiring the requestor

to bear all of the government's nearly $200,000 in costs).

If Dr. Selden's production was being conducted in response to a FOIA request rather than

pursuant to a subpoena, the search and review charges would be $40.00 per hour for mid-grade

employees, and duplication costs would be $0.10 per page based on the current fee schedule.

B - 11

**Exhibit B**

See 21 C.F.R. § 20.45. Based on an estimated volume of up to 120,375 pages of documents and the assignment of three full-time, mid-grade employees for 6 hours per day for twenty-two months, the duplication costs would be approximately $12,000 and the search and review charges would be approximately $317,000.

*Dr. Selden's Position*:

Dr. Selden, a private citizen, is being accused of fraud by the federal government in an enforcement action that almost certainly would not have been brought without the assistance of FDA. The FDA's involvement in this case stems back to the earliest phases of the SEC's investigation. Having supplied critical assistance to the SEC, including "off the record" interviews of key witnesses, the FDA now wants Dr. Selden to bear the burden and expense of seeking discovery from the very agency that is behind the lawsuit against him. This is unfair and inappropriate.