# TAB E

1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3      _____
4      RICHARD F. SELDEN,
                    Plaintiff,        Civil Action No. 06-11807-NMG
5
       V.                             November 3, 2006, 11:15 a.m.
6
       UNITED STATES FOOD AND DRUG
7      ADMINISTRATION,
                    Defendant.
8      _____
9
10
11

                            TRANSCRIPT OF HEARING
12
                 BEFORE HONORABLE NATHANIEL M. GORTON
13
                     UNITED STATES DISTRICT COURT
14
                 JOHN J. MOAKLEY U.S. COURTHOUSE
15
                        ONE COURTHOUSE WAY
16
                         BOSTON, MA   02210
17
18
19
                       DEBRA M. JOYCE, RMR, CRR
20                      Official Court Reporter
                   John J. Moakley U.S. Courthouse
21                  1 Courthouse Way, Room 5204
                         Boston, MA   02210
22                         617-737-4410
23
24
25

Page 2

```
 1    APPEARANCES:
 2
      FOR THE PLAINTIFF:
 3
      JUSTIN J. DANIELS, ESQ.
 4    THOMAS J. DOUGHERTY, ESQ.
      Skadden, Arps, Slate, Meagher & Flom, LLP
 5    One Beacon Street
      Boston, MA  02108-3194
 6    617-573-4800
 7
      FOR THE DEFENDANT:
 8
      MARK T. QUINLIVAN, ESQ.
 9    Assistant United States Attorney
      Office of the United States Attorney
10    John J. Moakley U.S. Courthouse
      1 Courthouse Way, Suite 9200
11    Boston, MA  02210
      617-748-3100
12
13    JENNIFER ZACHARY, ESQ.
      Department of Health and Human Services
14    Office of the Chief Counsel
      Food and Drug Administration
15    5600 Fishers Lane
      Rockville, MD  20857
16    301-827-9572
17    INTERVENORS:
18    FRANKLIN C. HUNTINGTON, IV, ESQ.
      DAVID E. BUTLER, ESQ.
19    Securities & Exchange Commission
      73 Tremont Street
20    Sixth Floor
      Boston, MA  02108
21    617-424-5940
22
23
24
25
```

1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable Nathaniel M. Gorton, United States

4    District Judge, United States District Court, District of

5    Massachusetts, at the John J. Moakley United States Courthouse,

6    1 Courthouse Way, Boston, Massachusetts, on November 3, 2006.)

7              THE CLERK:  This is civil action 06-11807, Richard

8    Selden v. The U.S. Food and Drug Administration.

9              Counsel please identify themselves for the record.

10             MR. DOUGHERTY:  Your Honor, for the plaintiff,

11   Richard Selden, Thomas Dougherty, Justin Daniels.

12             THE COURT:  Good morning Thomas Dougherty and

13   Justin Daniels.

14             MR. QUINLIVAN:  Good morning, your Honor.  Mark

15   Quinlivan for the defendants.  With me is Jennifer Zachary from

16   the Office of Chief Counsel of the FDA.

17             THE COURT:  Good morning to you Mr. Quinlivan and

18   Ms. Zachary.

19             MR. HUNTINGTON:  Good morning, your Honor.  Frank

20   Huntington, David Butler for the Securities and Exchange

21   Commission, and I guess we are technically intervenors today.

22             THE COURT:  Yes.  Good morning to you

23   Mr. Huntington and Mr. Butler.

24             We are here this morning on this new matter of

25   Selden v. U.S. Food and Drug Administration, which emanates

1    from an action before this session that we dealt with a little

2    earlier involving the Securities and Exchange Commission

3    against Mr. Selden and a subpoena -- or rather several

4    subpoenas that were entered in that case to produce documents

5    to the United States Food and Drug Administration.

6           And that matter proceeded in the United States

7    District Court for the District of Columbia, which ultimately

8    allowed the subpoenas to go forward and did not quash them.

9    The Food and Drug Administration responded that it would take

10   them something like 22 months to respond in toto, but, as I

11   understand it, nevertheless, did start making production of

12   documents.

13          I guess the first order of business before we get

14   into the question of jurisdiction, which of course is crucial,

15   is to find out what the status of the production of the

16   documents is.

17          Maybe, Mr. Daniels, you can let me know what's

18   going on in that regard, and then I'll hear from the Food and

19   Drug Administration.

20          MR. DANIELS:  Of course, your Honor.  The

21   production is continuing slowly, and the parties are still

22   trying to negotiate and narrow the requests further in the hope

23   that there will be resolution, but that there are --

24          THE COURT:  And this is in connection with the

25   matter that was submitted to this Court as a result of the

1    order of the United States District Court in the District of

2    Columbia.  And I have tried to peruse the Exhibit A that

3    outlines all of the categories of documents that were to be

4    produced, and it seems to me that the major stumbling block was

5    the deliberative process privilege that was or is being claimed

6    by the Food and Drug Administration and that apparently is the

7    cause for the delay.  Has that been dealt with in any

8    significant way?

9              MR. DANIELS:  I don't want to speak for the FDA,

10    but my understanding of their position is that issue -- we

11    disagree with it -- but that issue was not ripe because they

12    actually haven't asserted it over any particular documents.

13    And we would argue that that issue is certainly ripe because

14    they've stated --

15              THE COURT:  Is certainly what?

16              MR. DANIELS:  Certainly ripe for judicial

17    consideration because they've stated that they're not going

18    to -- that they are not going to waive that privilege, as

19    they've done in another very similar case, and that we

20    understand that that is one of their reasons why they

21    anticipate there being a 22-month production period.  That and

22    the question of confidentiality and trade secrets, those are

23    the two, is what I think they anticipate being --

24              THE COURT:  Maybe I should hear from Mr. Quinlivan

25    or Ms. Zachary in that regard.

1          MR. QUINLIVAN:  Thank you, your Honor.  May it

2     please the Court.  With regard to production, as we set forth,

3     the FDA has already produced 600 pages and anticipates the

4     production of 8,400 more pages by December 31st of this year.

5          With regard to the remaining -- actually, I would

6     say that the most significant stumbling block is a particular

7     request regarding the -- what are investigatory new drug

8     applications and the biological letter applications regarding a

9     particular drug that might involve up to 125,000 pages of

10    documents.

11          As we've set forth, if that request can be

12    narrowed, that could knock off potentially somewhere between 5

13    and 19 months of that 22-month schedule.

14          The other aspect, which is most difficult about

15    this, is that they have asked for every -- what -- it's -- the

16    acronym is CLA, but it's every one going back to 1987, and

17    there are approximately 9,229 in number.  And the FDA does not

18    have an automatic system to review those, and so what has to be

19    done is to go through --

20          THE COURT:  9,000 documents or 9,000 boxes, or

21    9,000 what?

22          MR. QUINLIVAN:  Well, there are 9,229 of these -- I

23    think it's -- the CLAs, which have to be found within -- in

24    other words, it's not simply a matter of opening a file and

25    here are the 9,229.  It would be as if somebody asked for every

1   document in this Court's session in which the government

2   asserted the discretionary function exemption under the FTCA.

3   One couldn't go either online or on Pacer and find that.  One

4   would have to literally go through every case to find where the

5   United States was a defendant, and then in an FTCA case, where

6   the deliberative process privilege exemption was asserted.

7              So because we're going back to 1987.  Some of this

8   is going to be literally page-by-page review to find these

9   CLAs.  So that also --

10             THE COURT:  What does CLA stand for?

11             (Discussion off the record.)

12             MR. QUINLIVAN:  I'm sorry, it's CRL, and it's what

13  is known as the Complete Response Letter.

14             THE COURT:  Complete Response Letter.  Okay.

15             MR. QUINLIVAN:  Now, I would point out -- and this

16  is in the declaration of Ms. Sager -- that going back to the

17  major stumbling block, I would say, which is the IND and BLA

18  requests regarding the drug Fabrazyme -- and this is in

19  paragraph 36 --

20             THE COURT:  I'm not sure if I have that in front of

21  me right now, but --

22             MR. QUINLIVAN:  If your Honor --

23             THE COURT:  Why don't you just --

24             MR. QUINLIVAN:  I'd be happy to quote from it.  It

25  says, "Narrowing the subpoenas to exclude documents in the

1   Fabrazyme BLA and IND would save between 5 and 19 months of

2   production time.  The remaining requests for CDER documents and

3   subpoenas are not anticipated to require a significant amount

4   of resources."

5           Because of the deliberative process, because the

6   FDA is in the process of collating and reviewing these

7   materials, a determination has not been made at this time as to

8   the trade secret redactions that need to be made, or where and

9   when to assert the deliberative process privilege.  So that,

10  ultimately, may result in a stumbling block, but that is --

11          THE COURT:  With that in mind, why not agree to

12  some sort of protective order that limits the disclosure of any

13  of this information to only those involved in this lawsuit?

14  It's not, as I understand it, the intent of anybody to

15  publicize any of this material to the general public.  Its only

16  relevance is to the SEC's claim against the plaintiff in this

17  proceeding.  So why can't the Food and Drug Administration

18  agree to some sort of a protective order to avoid the necessity

19  of having to make this search more onerous than it would

20  otherwise be?

21          MR. QUINLIVAN:  Well, your Honor, I think that if

22  this were a Privacy Act action that that would be something --

23  because the Privacy Act has a particular statutory provision

24  that allows a court to enter protective orders, and therefore,

25  the material can be released.  And I'm sure your Honor has

1    entered Privacy Act protective orders in litigation.

2          But the -- my understanding that the statutes and

3    the regulations at issue here do not allow for that, or provide

4    for that, and I'm not sure, for example, that even if the

5    documents were produced pursuant to such a protective order,

6    say regarding to the deliberative process privilege, that may

7    very well constitute a waiver with respect to other -- I'm not

8    sure that the fact that this Court -- that we agree to a

9    protective order would necessarily immunize the documents from

10   a waiver claim in other litigation.

11         THE COURT:  Why is that?  If it were in response to

12   an order of a court to produce documents in connection with a

13   specific litigation, you're contending that it would somehow

14   constitute a waiver?

15         MR. QUINLIVAN:  Well, I have not researched that

16   question, your Honor, but I would say that this is, again,

17   different from --

18         THE COURT:  There's no precedent that I'm aware of

19   that that has occurred in any other field, but, you know, I'm

20   always willing to be educated.  But I can't believe it would

21   happen.

22         MR. QUINLIVAN:  I'd be happy to take a look at

23   that.  But I think with respect to the trade secret, which is

24   the more troubling, and I think --

25         (Discussion off the record.)

1          MR. QUINLIVAN:  Pursuant to the statute -- and

2    again, I'm just opposing this with the Privacy Act -- which has

3    a provision that allows a protective order to be made whereby

4    Privacy Act protected information can be revealed in court.

5    The FDA statute at issue here prohibits the release of trade

6    secret information to third parties, and it's set forth -- it's

7    18 USC section 1905, 21 USC 331(j).

8          There is no corresponding provision in those

9    statutes that allows for the kind of protective order that can

10   be entered in a Privacy Act matter.

11         MR. DANIELS:  Your Honor, may I --

12         THE COURT:  Okay.  Yes, I'll hear you, Mr. Daniels.

13         MR. DANIELS:  Thank you, your Honor.  This is where

14   the rubber hits the road.  This is the issue that will cause

15   this 5- to 19-month delay, so it obviously is critical to us.

16         THE COURT:  Wait a minute.  The delay that we were

17   dealing with before was 22 months; and what Mr. Quinlivan has

18   just said, if you could agree, you could save 5 to 19 months,

19   right?

20         MR. DANIELS:  Exactly.  They're saying if we can

21   agree to fully -- to not pursue this discovery at all, the

22   discovery that we've already agreed to with the FDA, if we now

23   go back on that and agree not to pursue that, then that would

24   save the time.

25         But the reason that there is that delay is because

Page 11

1    of their -- what they feel they're required to do, which is to

2    redact all these documents.  And I would point out to the Court

3    that I did look at this question of protective orders being

4    entered, and the fact --

5         THE COURT:  With respect to trade secret

6    information?

7         MR. DANIELS:  With respect to trade secret

8    information, your Honor.  In fact, the law does provide for

9    federal agencies to produce the documents under court order.

10   And, for example, the statute that Mr. Quinlivan just cited, 18

11   USC 1905, provides that documents shall not be, you know,

12   produced to the extent -- to any extent not authorized by law.

13   And there are cases where the courts have held specifically

14   that a discovery protective order is -- does include an

15   authorization by law to produce it.  And I'll just give you one

16   example, your Honor, if that's okay:  United States v. W.R.

17   Grace, decided in August of this year, 2006, WestLaw 2942707.

18   And the court specifically addressed the question of the Trade

19   Secrets Act and stated that "The production of the documents in

20   question is compelled by this court's discovery order, which

21   the disclosure of the documents is authorized by law,

22   therefore, the government must produce all documents identified

23   it is withholding subject to the protective order."

24        I'll also mention that the FDA's own regulations

25   provide for the disclosure of otherwise non-public information

Page 12

1  in connection with court proceedings.  And I will cite to the

2  Court 21 CFR 20.86, which is titled Disclosure in

3  Administrative or Court Proceedings.  And it states, "The data

4  and information otherwise exempt from public disclosure may be

5  revealed under certain circumstances or court proceedings where

6  data or information are relevant."

7        So with all due respect to Mr. Quinlivan, I think

8  the law does provide for an exception in a case like this where

9  the Court enters a protective order.  And that is certainly

10  under law providing for limited disclosure.  And I think that

11  given -- with a protective order, I think the question of

12  deliberative process privilege and trade secret goes away; and

13  the main cause of what appears to be what they're saying is the

14  cause of what a projected 22-month delay is would go away.

15        Thank you.

16        THE COURT:  All right.  Mr. Quinlivan, do you want

17  to respond to that?

18        MR. QUINLIVAN:  Just briefly, your Honor.

19        With respect to the trade secret, because I think

20  that is the more troubling question, I would like to emphasize,

21  again, that the agency has not even decided whether it will

22  assert the deliberative process privilege until its had the

23  opportunity to review the documents.

24        But the fact is that not only does the statute

25  prohibit the release of this information, but FDA's own

1    regulations, and I cite 21 CFR section 20.48, requires FDA to

2    give notice to a person who will be affected by a proposed

3    disclosure of data or information contained in Food and Drug

4    records and permit them to institute suit in a U.S. District

5    Court to enjoin the release of records.

6            So even if -- and we don't think a protective order

7    of this sort is allowed by the law, but even if one was

8    entered, you would literally have -- the FDA would be required

9    to give notice to every company that is affected by this, and

10   they would have the opportunity to file suit in this court to

11   challenge the release of that information.

12           THE COURT:  Well, okay.  We've talked about the

13   merits or demerits of the order of production before we've

14   talked about the jurisdictional issue, which is whether or not

15   this Court has jurisdiction to take over this matter.

16           As I understand it, the United States District

17   Court in the District of Columbia, Judge Urbina, has under

18   advisement a motion by the plaintiffs here, the defendants in

19   the SEC case, to what, expedite the determination of what can

20   and cannot be produced; is that right?

21           MR. DANIELS:  Your Honor, there is no outstanding

22   motion before the court in the District of Columbia.  What --

23   when the court granted Dr. Selden's motion to compel, it asked

24   the parties to submit a joint status report.  And in that joint

25   status report -- well, leading up to that joint status report,

Page 14

1    I should say, the FDA counsel and myself spent many, many hours

2    negotiating the scope of production, and that scope was agreed

3    to but for one exception.  We agreed to the scope of the

4    production, and provided that information to the court and to

5    this Court on August 25th.  In addition to that, we provided

6    what we considered to be open issues regarding the FDA's

7    compliance with that order.

8            We would submit, your Honor, that that does not

9    take away from the finality or the fact that that order is not

10   final and can't be followed.  The FDA itself is already

11   agreeing to the substance of the production.  The only other

12   open issues --

13           THE COURT:  Where does the ball lie now with

14   respect to the District Court in the District of Columbia?

15           MR. DANIELS:  Where does jurisdiction lie now?

16           THE COURT:  Yes.  As I understand it, your client

17   requested a conference with the court and an order to enforce

18   compliance with the subpoenas on a more deliberative timetable

19   than the 22 months that was agreed to.  What's the status of

20   that?

21           MR. DANIELS:  We had asked for a conference, your

22   Honor.  The FDA, I should say, opposed that request.  We had

23   offered to make a joint request for a conference, and the FDA

24   said no.  So we alone requested the conference before the court

25   to discuss all of the open issues that we had listed, and there

Page 15

1    is no -- we provided the court with these pleadings.  We have

2    not heard from the court with regard to that request.

3                THE COURT:  So it was a motion for a hearing or a

4    request --

5                MR. DANIELS:  It was an informal -- not an

6    informal -- it was not a motion.  It was a line in the joint

7    status report that says we respectively request a conference.

8                THE COURT:  And you haven't followed up on that

9    since August or September of this year?

10               MR. DANIELS:  No.  We were waiting on the court on

11   that, and that's where that stood.

12               THE COURT:  So is it your position that the

13   District of Columbia court has anything more to do in this case

14   or not?

15               MR. DANIELS:  It's our position that the District

16   of Columbia court does have authority to resolve those

17   disputes, as this Court does have authority for different

18   reasons.  But that we are not expecting, although the court

19   could call for a status conference.  And if the court does, we

20   would ask the court to respectively stay or hold the case in

21   abeyance pending the outcome of the proceedings here.  We

22   aren't saying that our motions and papers that are filed in the

23   District of Massachusetts somehow divests that court of

24   authority over its own order.

25               THE COURT:  All right.  Mr. Quinlivan, on the other

Page 16

1  side of the coin, why is it that you allege that this Court has

2  no jurisdiction in this matter?

3          MR. QUINLIVAN:  We do so, your Honor, based on the

4  plain text of Rule 45 of the Federal Rules of Civil Procedure,

5  whether it be with regard to the question of whether the

6  issuance of a subpoena subjects a party to undue burden,

7  whether under Rule 45(c)(1); whether it be whether a subpoena

8  should be modified, quashed or enforced under 45(c)(3)(A);

9  whether it be that a party should be held in contempt for

10  failing to comply with a subpoena under Rule 45(e).  All of

11  those either talk about that the issuing court or the court on

12  whose behalf the subpoenas were issued has the power, and the

13  sole power to act.  And that is why every court, including the

14  DC Circuit, has held that the text of Rule 45 makes clear that

15  only the issuing court has the power to enforce --

16          THE COURT:  Couldn't the plaintiff have sought to

17  have this Court issue the original subpoena?  Doesn't this

18  Court have jurisdiction over the Food and Drug Administration?

19          MR. QUINLIVAN:  Well, the Food and Drug

20  Administration is located in -- actually, in Maryland.  And

21  that was the plaintiff's decision, to issue --

22          THE COURT:  They do business in Massachusetts and

23  have an office here, do they not?

24          MR. QUINLIVAN:  We do -- they do have an office

25  here, yes.

1          THE COURT:  So this Court would have been an

2    appropriate court to have issued the subpoenas in the first

3    place.

4          MR. QUINLIVAN:  I don't think so, your Honor,

5    because the documents in question are in Washington, D.C.

6          THE COURT:  But the party seeking them is in

7    Massachusetts, and it seems to me --

8          MR. QUINLIVAN:  It's not a question -- with respect

9    to Rule 45, it's not a question of where the party who is

10   seeking them is located, it's based on the non-party where

11   those documents are located, and that is -- quite frankly, you

12   know, if the plaintiff had thought that a subpoena could issue

13   from the District of Massachusetts, they could have attempted

14   to issue the subpoenas here and we could have litigated that

15   question.  But they didn't.  The fact of the matter is they

16   were issued out of the District of Columbia, and with --

17         THE COURT:  Isn't it your position that the

18   District of Columbia court could not, if requested by the

19   plaintiff, transfer the matter to Massachusetts?

20         MR. QUINLIVAN:  It is our position, and I would

21   note, and we pointed this --

22         THE COURT:  Why couldn't they do that?

23         MR. QUINLIVAN:  Well, because the D.C. Circuit in

24   the In Re Sealed Case decided that the text of Rule 45

25   prohibits the transfer of such a motion.

1          There is, actually, a disagreement among the courts

2     on that question.  I point out -- in our memorandum in support

3     of our motion to dismiss we pointed that out on page 12,

4     footnote 5.  We pointed out there actually are some courts,

5     including the 8th Circuit and the District of Maryland, that

6     have suggested that perhaps such a motion could be transferred.

7          The DC circuit in In Re Sealed Case rejected that

8     argument and held it had no textual support.  And in as much as

9     Judge Urbina is bound by the decision at the D.C. Circuit, the

10    U.S. District Court for the District of Columbia could not

11    transfer that case to this Court.

12         THE COURT:  Well, then why did Judge Urbina order

13    the Food and Drug Administration to not only give it a joint

14    status report, but to give this Court a joint status report

15    back in its order of August 16th?

16         MR. QUINLIVAN:  Well, I can't speak for Judge

17    Urbina.  I assume that as a matter of commodity he certainly --

18    given that the underlying action is in front of this Court, he

19    wanted this Court to be aware of the proceedings in the

20    District Court.  But I don't think that that action in any way

21    suggests that there is concurrent jurisdiction to act on a

22    Rule 45 subpoena.

23         And I would point out, again, that in their

24    response papers the plaintiffs have failed to cite a single

25    case in which Rule 45 has been interpreted differently.

1          The only case they cite is an unpublished decision

2     from the District of Kansas that merely states that where --

3     even where a subpoena is issued out of a different district

4     court, the court where the action is pending, nonetheless, can

5     enforce its own orders.  In that case there was a discovery

6     cutoff date that had already passed.  And the court simply said

7     I can enforce my own discovery cutoff date.  It didn't act on

8     the motion to quash the subpoenas issued by a different sister

9     court.

10          THE COURT:  It seems to me -- and just as a

11    practical matter -- that this is the tail wagging the dog.  The

12    case at issue is pending in this Court.  The subpoena that we

13    are fighting about bears upon the issues that are relevant to

14    an action before this Court, not the District Court of the

15    District of Columbia.  And to say that this Court has no

16    standing or jurisdiction to do anything to protect the

17    integrity of its docket and to move its cases along doesn't

18    strike me as logical.

19          MR. QUINLIVAN:  Your Honor, with respect, that's

20    the judgment that Congress made when it enacted and put in

21    force the text of Rule 45.  And I would point out that the D.C.

22    Circuit made that very point in the In Re Sealed Case.  They

23    made the point as a logical matter it may seem more -- it made

24    more sense to have the court where the action is pending

25    perhaps render a decision on the scope of discovery or the

1    timing of a response to a subpoena.  But the court said

2    Congress -- the balance that was struck by Congress was that

3    rule -- to protect non-parties, Congress was going to limit

4    jurisdiction to the issuing court.

5           So I'm not disagreeing with your Honor that it may

6    make more practical sense, but as a legal matter -- and every

7    court that has considered this question has come to that

8    conclusion -- Rule 45 does not permit anything -- any court

9    other than the issuing court to modify, quash, or, as here,

10   enforce an order or a subpoena issued out of a different

11   District Court.  And the plaintiffs are trying -- the

12   plaintiffs are trying to run away from the language of their

13   own -- this complaint, where what they say is what we seek is

14   meaningful compliance with the order issued by the District

15   Court.

16          Putting aside the fact that there are several

17   questions, significant questions that remain pending in front

18   of Judge Urbina, most particularly Judge Urbina expressly said

19   that he was not deciding whether the subpoenas were unduly

20   burdensome.  He put it in one of the subheadings of his

21   opinion.

22          So the question about burdensome is still pending

23   in front of Judge Urbina.  And if the plaintiff wants to

24   enforce that or if it thinks that the FDA is acting dilatory,

25   then they had every opportunity to file an action in front of

1  Judge Urbina, the very same motion that they filed in this

2  Court, seeking the relief.

3          Instead they came to this Court -- and I think when

4  your Honor -- when your Honor had the SEC and plaintiff here in

5  front of him in the September hearing, I think your Honor quite

6  presciently noted that there's a serious question about

7  jurisdiction here.  You might be inclined to do something but

8  you had to look at the jurisdictional question.  And that's a

9  question that the plaintiff has not answered here.

10          THE COURT:  Mr. Daniels -- Mr. Dougherty.

11          MR. DOUGHERTY:  Let me just address one aspect of

12  this.  There's no question, I think, and the government doesn't

13  contend otherwise, that this Court has jurisdiction and control

14  over its own docket.  The remedies that this Court could apply

15  with respect to that include some pretty strict remedies,

16  including preclusion, and that I don't think is controverted.

17          So I believe that the Court has both jurisdiction

18  over the docket and the matter and the FDA and remedies.  They

19  happen to be more extreme than the types of remedies available

20  to a court in looking at and working through the burden and

21  other relevance questions that may or may not be applicable to

22  a subpoena.  Relevance is usually not applicable to a subpoena

23  or protective order.

24          THE COURT:  Let me ask you the same question I

25  asked Mr. Quinlivan.  Do you believe that your client had the

1    option to seek a subpoena against the Food and Drug

2    Administration in this court originally?

3         MR. DOUGHERTY:  No, no.  I think we agree with them

4    on that.  The way I have read it all my life is that the

5    non-party and the location of the non-party and its documents

6    in this case is the governing element.  And then following

7    that, your Honor asked about transfer.  I am not sure -- that

8    may -- I believe the DC Circuit has spoken on that with respect

9    to its circuit.

10        So we thought we were compelled to go where we

11   went.  And then at the point that we thought we had a

12   successful resolution from Judge Urbina, but we are running out

13   of time with respect to this Court's trial schedule.  And Judge

14   Urbina had said that we should inform this Court, as we would

15   have anyway, of his determination.  We realized we need to

16   proceed on two bases -- not get out ahead of Judge Urbina --

17   ask for that status conference, which they opposed.

18        We're happy to walk in there tomorrow and deal with

19   that.  Not inconsistently with here, I will say, but Judge

20   Urbina does not have the trial schedule that this Court has for

21   the Selden case that we have.  And we're getting caught

22   between, on the one hand, a very deliberative judge with a lot

23   of things to do.  You may have noticed if you look at the time

24   between which the inputs and outputs came from Judge Urbina's

25   court matters, they have a certain length to them.  In

Page 23

1    addition, there was a pending case in the D.C. Circuit that

2    bore on the ultimate resolution here.

3          THE COURT:  That's what I understood to be the main

4    reason for his waiting.

5          MR. DOUGHERTY:  Absolutely.  And then we are -- so

6    we are current, I think, with Judge Urbina.  But this --

7          THE COURT:  But you're not current with respect to

8    the request that Mr. Daniels talked about, at least following

9    up on the request made of him to make a determination as to

10   whether 22 months was a timely compliance with the subpoena,

11   right?

12         MR. DOUGHERTY:  But timely in which sense, Judge?

13   We are facing a trial schedule here, so that --

14         THE COURT:  Well, presumably you've informed Judge

15   Urbina --

16         MR. DOUGHERTY:  Yes.

17         THE COURT:   -- that you have obligations in

18   another United States District Court case.

19         MR. DOUGHERTY:  Yes, yes, yes.  Absolutely.  And

20   so, therefore, we are happy to get direction, we're happy to

21   proceed on either path, but without belaboring it, we

22   absolutely think we are entitled to, and have pursued

23   energetically the procuring of the relevant documents here.

24   And we need to then proceed in a way that either -- either says

25   to the FDA, look, you've even opposed a status conference,

1   you've opposed -- you've used every power you've had to oppose

2   our applications.  We can deal with that in that court, but if

3   there's no other remedy available, then we would ask this Court

4   for a preclusion order.

5           We're not going to be prejudiced having

6   energetically pursued one path, and we'll keep pursuing it, but

7   we're not going to be prejudiced on a trial schedule,

8   respectfully, we would submit; and, if the remedy for that is

9   preclusion, so be it.

10          THE COURT:  Preclusion against the Securities and

11  Exchange Commission.

12          MR. DOUGHERTY:  Yes, who received without --

13  voluntarily and cooperatively from the FDA documents, including

14  internal documents of the FDA in this matter that are the

15  analog to what we are seeking, but without any -- voluntarily,

16  cooperatively, without any of this, you know, effort that we've

17  had to go through.

18          THE COURT:  All right.  Mr. Quinlivan, one more

19  time, and I'll hear from the SEC.

20          MR. QUINLIVAN:  Three points, briefly, your Honor.

21  There's no pending motion in front of the District Court in

22  DC.  The plaintiff has not requested formally a hearing, a

23  motion to enforce, or anything of that nature.  A single line

24  in a joint status report under the DC local rules is not

25  sufficient.  You actually have to move for a hearing.

1            Secondly, I've been reliably informed that the

2    amount of documents that the FDA provided to the SEC is about

3    that much (indicating).  Nothing compared to the scope of the

4    document production request that the plaintiff has asked for

5    here, which can run up to 125,000 pages.

6            And, finally, if I could just -- on the question of

7    efficiency, just so I can point your Court to the citation

8    which is in the DC Circuit's decision in In Re Sealed Case, 141

9    F.3d at page 341.  That's where the court said while the court

10   in which the underlying litigation might in some circumstances

11   be in a better position to adjudicate discovery disputes,

12   quote, Congress and the rules has clearly been ready to

13   sacrifice some efficiency in return for territorial protection

14   for non-parties.

15           THE COURT:  All right.

16           MR. QUINLIVAN:  Thank you, your Honor.

17           THE COURT:  Mr. Huntington, does the Securities and

18   Exchange Commission have anything it wishes convey to the Court

19   in this controversy?

20           MR. HUNTINGTON:  Yes, your Honor, we do, not on the

21   jurisdictional issue, but on the preclusion issue.

22           The issue in our case -- our case concerns what did

23   the FDA say to the company and to Dr. Selden, and what did

24   Dr. Selden and the company then say to investors?  Our case

25   does not involve internal deliberations of the FDA; it involves

1   what did the FDA say to the company, what did the company say

2   to the investors?

3           Mr. Dougherty seems to have brought his set of our

4   documents with him.  I brought our set.  This is what we got

5   from the FDA (indicating).  It's basically communications

6   between the FDA and the company.  I think Mr. Dougherty has his

7   set right there.  That was it.  We took investigative testimony

8   from precisely one FDA witness, Dr. Walton; they have that

9   transcript.  The FDA has offered to make Dr. Walton available

10  for deposition.

11          Your Honor, I suspect we're being set up for a

12  preclusion order that has no basis in the merits in our case.

13          Dr. Selden is asking for the entire file from the

14  Genzyme application, which has nothing -- the fact that Genzyme

15  had filed an application is mentioned in our complaint, but the

16  merits of that application or the FDA's review of that

17  application has nothing to do with the issues in our case, but

18  will require them to redact tens of thousands of pages.  No

19  need for that.

20          They have asked for every one of those complete

21  response letters for the last 15 or 20 years, none of which

22  were mentioned in communications to the company, none of which

23  Dr. Selden saw at the time, but somehow if they don't have

24  those, they're going to be deprived of a fair defense.

25          I think we're being set up, your Honor.  I don't

1  think it's fair.

2                THE COURT:  Well -- okay.  Final -- Mr. Dougherty,

3  one last word.

4                MR. DOUGHERTY:  Just because by way of example,

5  there's no setup.  These are materials voluntarily provided by

6  the FDA to the SEC that relate to internal communications at

7  the FDA, including e-mails to ten different people by the man

8  at the top on this application --

9                THE COURT:  So you don't have the same documents

10  that Mr. Huntington has?

11                MR. DOUGHERTY:  These were provided -- let me just

12  finish.  These were provided to the SEC on one theory, which

13  was a mistake in theory that Mr. Selden and TKC somehow wanted

14  to influence the timing of the advisory committee for an

15  improper purpose.

16                What I'm getting at is that the statement what is

17  at issue in this case is not internal communications is

18  mistaken.  We absolutely are looking for the equivalent -- this

19  is only one issue that they pursued because they have one

20  witness that they pursued in one respect and the documentation

21  they found, we submit, will contradict their theory.  But, more

22  importantly, their pursuit was of --

23                THE COURT:  First, let me understand -- wait a

24  minute.  Mr. Huntington says he has documents that were

25  external documents from the FDA that seem to be about the same

1  volume as what you're holding; and you say those are internal

2  documents, those are not the same documents.

3         MR. DOUGHERTY:  No, these -- no.  These documents

4  are internal e-mails regarding the discussion within FDA of the

5  advisory committee because they had the theory that TKT was

6  trying to influence the timing of that.  These were not

7  externalized to TKT; these are internal.  Similarly, with

8  regard to these complete response letters on the defense of the

9  case, we're going to show that inside the FDA the discussion

10  and the assessment of TKT and where it stood at each point in

11  time is much richer, much more complex and much more changing

12  than the simple view of life that the SEC with its one witness

13  wants to present.  As a result of which, therefore, the

14  discussions by TKT of where it was were in proportion in light

15  of a much different situation than they are oversimplifying to

16  make it look.

17         And we are entitled -- if this were a private case

18  of private litigants and each side was asking for the internal

19  documentation relevant to the issues in the case of the other,

20  there would be no discussion; they would be provided.  And

21  here, that's what we are asking for, is how the FDA assessed

22  TKT at each stage --

23         THE COURT:  Except that, apparently, you're asking

24  for hundreds of thousands of documents.

25         MR. DOUGHERTY:  I think that overstates it.  Let's

Page 29

```
 1    go into -- it breaks down into three parts.  We have said to

 2    them with respect to the TKT information that TKT provided to

 3    the FDA, we don't need it back, we already have that.  But in

 4    their complaint they acknowledge and they criticize TKT for

 5    misstating its situation in the race for orphan drug approval

 6    against another company, Genzyme.  It's right in the complaint

 7    that TKT was misstating its position and its place in the race

 8    with Genzyme.  So that is why we have asked for the equivalent

 9    documentation relating to FDA's consideration of TKT and

10    Genzyme, because that's what was happening at the same time.

11    And we are going to show that we didn't misstate the

12    relationship in the race with Genzyme.  So that's why there are

13    documents --

14            THE COURT:  Why can't the extent of that

15    documentation be limited?  Why does it have to extend to the

16    entire Genzyme application?

17            MR. DOUGHERTY:  We have negotiated with them -- and

18    it's on the exhibit --

19            THE COURT:  Them meaning whom?

20            MR. DOUGHERTY:  The FDA.  In fact, the Exhibit A to

21    Judge Urbina and to this Court, the very first paragraph is the

22    negotiated scope related to Fabrazyme, that's the Genzyme

23    product.  And the FDA's position on that was subject to the

24    issue of redaction and privacy and trade secret.  The redaction

25    could take considerable period of time, but that, in and of
```

1    itself, these documents on Fabrazyme are not otherwise so

2    burdensome as to not be producible in the negotiated resolution

3    you see.

4            This is a situation in which TKT and Mr. Sullivan

5    have produced over 50,000 pages of documents.

6            So we're happy to work with them.  We already did

7    all summer with regard to the scope on that.  And during that

8    time frame, the SEC was aware that we were working on that

9    negotiation and never interceded on that negotiation and never

10   took the position that they're now taking that somehow or

11   another they should be off limits.

12           And the next -- the next and last that I'll say is

13   with regard to the CRLs, the Complete Response Letters.  We

14   would be happy to limit that to the Complete Response Letters

15   from January 1, 1998 through December of 2002, which is the

16   time frame of the pendency of this TKT application, and limit

17   it to CBER, C-B-E-R, which is the subset within -- subdivision

18   within FDA.  We'd do that right now.  And that is not a large

19   undertaking, but it is central to our case.  Why?  Because,

20   again, we're going to show that the way in which this company

21   reflected that Complete Response Letter was absolutely

22   standard.  We're going to show that.  And we can show that both

23   with respect to -- you know.

24           THE COURT:  All right.  Thank you, counsel.

25           What I'm going to do is this:  I'm going to extend

1    the time periods for discovery that are either expired or about

2    to expire 90 days.  I'm going to instruct the plaintiff in this

3    case, the defendant in the related case, that is Mr. Selden and

4    its counsel, to pursue with all due diligence whatever remedy

5    it believes, he believes, it has in the District Court for the

6    District of Columbia with regard to the compliance by the Food

7    and Drug Administration with the outstanding subpoenas,

8    including, if he sees fit, any motion to that court to involve

9    this Court in the process.  That is, if there is an

10   availability of transfer of jurisdiction over this matter --

11   the FDA claims there is none, I'm not so sure, but that is up

12   to the plaintiff to follow up.  But, in any event, to pursue as

13   diligently as possible with the understanding that it has now a

14   requirement that is put off by 90 days to complete the

15   discovery in the SEC litigation.

16          If either the plaintiff or the Food and Drug

17   Administration want to further advise this Court on whether or

18   not this Court can do anything further with respect to the

19   controversy involving the discoverable documents, then I will

20   entertain such further legal advice.  Otherwise, I will take

21   the matter under advisement, both the FDA's motion to dismiss

22   and Mr. Selden's motion for a preliminary injunction.  I'm not

23   going to act upon them now.  I'm going to review all of these

24   papers.  But with respect to the SEC case, the matter is

25   delayed 90 days, but no more.  We will see what transpires.

Page 32

1          The District Court of the District of Columbia

2    should be advised of the matter present in this Court and

3    understand what the status of the discovery order is here.

4          Yes, Mr. Huntington, before we adjourn.

5          MR. HUNTINGTON:  Yes, your Honor.  About a week

6    ago, Dr. Sullivan filed a motion to preclude directed to the

7    Commission.  I guess my question is:  Is your Honor going to

8    put that to the side while we resolve these issues, or do you

9    want our position --

10          THE COURT:  That matter will be taken under

11   advisement, and you do not need to answer at this time.  We'll

12   wait and see what happens in the preceding 90 days.

13          MR. HUNTINGTON:  Thank you, your Honor.

14          THE CLERK:  All rise.

15          (Court adjourned at 12:00 p.m.)

16                    ¡ ¡ ¡ ¡ ¡ ¡

17                    CERTIFICATION

18          I certify that the foregoing is a correct

19   transcript of the record of proceedings in the above¡entitled

20   matter to the best of my skill and ability.

21

22

23   _____        _____

24   Debra M. Joyce                          Date

25   Official Court Reporter